IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENYATTA JACKSON, | ) | CASE NO. 1:17-CV-2039 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Kenyatta Jackson ("Jackson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 11.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Jackson filed his application for SSI on July 31, 2014, alleging a disability onset date of July 27, 2007. Tr. 55, 247. He alleged disability based on the following: "cmc arthritis," depressive disorder, PTSD, lumbar and thoracic sprain and strain, insomnia and lumbar radiculopathy. Tr. 251. After denials by the state agency initially (Tr. 136) and on reconsideration (Tr. 151), Jackson requested an administrative hearing (Tr. 180). A hearing was held before Administrative Law Judge ("ALJ") Catherine Ma on May 13, 2016. Tr. 72-117. During the hearing, Jackson amended his alleged onset date to July 31, 2014. Tr. 75. In her August 3, 2016, decision (Tr. 55-67), the ALJ observed that a different ALJ had previously

denied Jackson benefits in an order dated November 13, 2012, and that there was no new and material evidence regarding Jackson's impairments since that 2012 decision.  Tr. 55. Accordingly, the ALJ adopted the findings of the prior ALJ and concluded that there are jobs that exist in significant numbers in the national economy that Jackson can perform, i.e. he is not disabled.  Tr. 55, 66.  Jackson requested review of the ALJ's decision by the Appeals Council (Tr. 217) and, on August 19, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Jackson was born in 1971 and was 42 years old on the date his application was filed.  Tr. 218.  He attended regular classes in high school until eleventh grade and had some training in electronic repair.  Tr. 81.  He previously worked as a box labeler in 2005 and 2006.  Tr. 83-84.

### B. Relevant Medical Evidence[1]

On September 12, 2014, Jackson saw his general practitioner Richard Weinberger, M.D., for a wellness exam.  Tr. 388.  He complained of depression that had been worsening over the last month and which was alleviated by his medication, citalopram.  Tr. 388.  He denied anxiety. Tr. 399.  Dr. Weinberger increased his citalopram.  Tr. 392.

On December 22, 2014, Jackson saw licensed social worker Nancy Blake for therapy. Tr. 435.  His presenting symptoms were depression and possible PTSD.  He was assessed on December 22 and January 5, 2015.  Tr. 438.  He reported being shot in 2007 and having problems since that time that had been worsening.  Tr. 438.  Upon exam, he was oriented, cooperative, made good eye contact, had sustained attention and concentration, had coherent

---

[1] Jackson only challenges the ALJ's findings regarding his mental impairments. Accordingly, only the medical evidence relating to those impairments is summarized and discussed herein.

speech (although he stuttered), and had a logical and organized thought process. Tr. 438. He denied delusions, hallucinations and paranoia. Tr. 438. He had poor insight and judgment. Tr. 438. Blake diagnosed him with PTSD and unspecified depression and the plan was to begin weekly therapy. Tr. 442. On January 12 and February 9, 2015, Blake reported that Jackson engaged easily and felt much calmer after a coping exercise. Tr. 449, 451. The plan was to continue to meet to address his treatment goals. Tr. 451.

Jackson and his wife saw psychiatrist Kristina Stefanac, M.D., on January 8, 2015. Tr. 477. Jackson reported that his disability application had been denied and that "the lawyers told us we need to see a psychiatrist." Tr. 477. He stated that he had been shot in a robbery in 2007 and had had depressive symptoms since then and they were getting progressively worse. Tr. 477. He reported low energy, poor concentration at times, poor sleep, and that he was distrustful of others. Tr. 477. Upon exam, he was oriented, had fair to poor insight and judgment, distractible attention and concentration, a euthymic mood and congruent affect, and he was cooperative, slightly guarded and aggressive. Tr. 478. Dr. Stefanac diagnosed him with PTSD, depression, a history of cocaine abuse in remission, and possible anxiety after his gunshot wound in 2007; assessed him as stable; and added a prescription for Wellbutrin. Tr. 478. On January 30 he reported that the Wellbutrin made him feel calm and that he had learned relaxation techniques in therapy that were helpful. Tr. 479. Upon exam, he was calm, cooperative and friendly. Tr. 479. He had no abnormal or psychotic thoughts and sustained attention and concentration. Tr. 479. Dr. Stefanac assessed him as improving and increased his Wellbutrin dosage. Tr. 479.

About a year later, on January 15, 2016, Jackson saw Dr. Weinberger complaining of back pain. Tr. 456. Jackson denied depression and anxiety and stated that he saw a therapist and that his symptoms were stable with medication. Tr. 456.

On March 30, 2016, Jackson visited the Murtis Taylor Human Services Center complaining of PTSD, severe depression, and wondering if he had bi-polar disorder. Tr. 498. He reported that he had visited with a psychiatrist and attended therapy in 2015 but that they no longer took his insurance. Tr. 498. His symptoms had worsened the last 6 months. Tr. 498. He reported bereavement issues from his grandmother's death in 1993, anxiety, traumatic stress, depression, mood swings, anger/aggression, oppositional behaviors, inattention, impulsivity, auditory hallucinations while in prison (in 2008), that he talks to an imaginary person, suspiciousness, and insomnia. Tr. 503. He was diagnosed with schizoaffective disorder, depressive type; PTSD; and personality disorders and mental retardation. Tr. 507.

### C. Medical Opinion Evidence

#### 1. Treating Source

On April 26, 2016, social worker Nancy Blake completed a medical source statement on behalf of Jackson. Tr. 484-485. Blake opined that Jackson could rarely deal with the public, coworkers and supervisors, work in coordination with others without being distracted, deal with work stress, complete a normal work day and work week, socialize, manage funds and schedules, and leave home on his own. Tr. 484-485. He could constantly maintain regular attendance and be punctual. Tr. 484. Black stated that Jackson suffers from posttraumatic stress disorder with dissociative symptoms and a schizophrenia spectrum disorder and other psychotic disorder based on persistent auditory hallucinations. Tr. 485.

#### 2. Consultative Examiner

On October 31, 2014, Jackson saw psychologist Jeff Rindsberg, PsyD., for a consultative examination. Tr. 416-420. Dr. Rindsberg commented that there was no history or current indication of psychosis of any kind. Tr. 419. He diagnosed Jackson with PTSD and unspecified depressive disorder and opined that Jackson could understand, remember and carry out instructions without difficulty; that maintaining attention and concentration is "a problem"; he would have difficulty maintaining persistence and pace and had a low tolerance for frustration; dealing with people was "a problem" as he was highly mistrusting and paranoid; and he would not be able to persevere and handle stressful situations well. Tr. 420.

### 2. State Agency Reviewers

On December 10, 2014, state agency reviewing psychologist Jennifer Swain, Psy.D., reviewed Jackson's record. Tr. 147. Regarding his mental RFC, Dr. Swain adopted the prior ALJ's mental RFC determination: Jackson has concentration sufficient to perform routine, repetitive tasks; social functioning is adequate for superficial and occasional interactions with others; stress tolerance allows for adaptation to work settings in which duties are routine and predictable; and he required a static work environment with infrequent changes. Tr. 147, 61. On March 4, 2015, state agency reviewing psychologist Leslie Rudy, Ph.D., reviewed Jackson's file and adopted Dr. Swain's opinion. Tr. 160.

### D. Testimonial Evidence

#### 1. Jackson's Testimony

Jackson was represented by counsel and testified at the administrative hearing. Tr. 74. He lives in a house with his wife and five children, aged 4-16. Tr. 79-81. He does not have a driver's license; it has been suspended since 2007. Tr. 81-82. His mom and wife drove him to the hearing. Tr. 82.

When asked why he cannot work full time, Jackson answered that it was because of his pain and issues with people. Tr. 85-86. When asked how long he has been experiencing mental health problems he said that he always felt this way. Tr. 89. He sees a psychologist and goes to a therapist once a week. Tr. 89. He has been taking medication for a long time. Tr. 89. His therapist says that it seems like he has been getting better. Tr. 90. Once his medication kicks in it calms him down. Tr. 107.

Jackson stated that he does not deal with people and he does not go outside. Tr. 90. He has been married for 16 years. Tr. 90. He also regularly sees his mom; he sees other family members if they come over to the house but he does not visit anyone. Tr. 91. He sees no friends and is involved in no groups. Tr. 91. He feels funny in crowds. Tr. 98. He had gone to a CA (Cocaine Anonymous) meeting with his father a few months prior to the hearing. Tr. 97-98. He has been sober since July 27, 2014. Tr. 96.

Jackson stated that has no phone or computer. Tr. 91. His hobby is watching fish in his fish tank. Tr. 91. His son helps maintain the tank. Tr. 91. He does not go shopping or do chores, although he cleans up after himself and maintains self-care. Tr. 94-95. He plays with his children. Tr. 95. During the day, six days a week, his wife takes the younger children to her mother's house. Tr. 96, 101.

Sometimes, Jackson has problems reading and comprehending what he has read. Tr. 98. He also has "somebody I talk to inside" whom he calls "Uncle Clint." Tr. 103. They have conversations about Jackson's family and Uncle Clint tells him not to do certain things. Tr. 103. This happens 3 or 4 times a week for about 20 minutes. Tr. 103. Jackson does not like enclosed spaces and used to not be able to be in a room with the door shut. Tr. 104. This happens even inside his home. Tr. 104. He recalled two instances when he had to be admitted to a psychiatric

unit. Tr. 105. He sometimes has thoughts of harming others but has never acted on it and he sometimes has thoughts of harming himself, which he has acted on "maybe once." Tr. 105. He has nightmares "all the time." Tr. 105. This interferes with his ability to sleep at night so he takes naps during the day. Tr. 106.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing. Tr. 111-115. The ALJ discussed with the VE Jackson's past work as a box labeler. Tr. 108. The ALJ asked the VE to determine whether a hypothetical individual with Jackson's age, education and work experience could perform past work or any other work if the individual had the following characteristics: can do a full range of light work; can occasionally climb ladders, ropes or scaffolds and stoop and crouch; can frequently crawl; can perform routine, repetitive tasks; can have superficial and occasional interactions with others; can adapt to work setting in which duties are routine and predictable; and must have a static environment with infrequent change. Tr. 109. The VE answered that such an individual could not perform Jackson's past work but could perform work as a small products assembler (217,000 national jobs, 10,000 Ohio jobs, 3,500 regional jobs); gluer (185,000 national jobs, 11,000 Ohio jobs, 2,500 regional jobs); and electronics worker (240,000 national jobs, 13,000 Ohio jobs, 4,000 regional jobs). Tr. 110.

Jackson's attorney asked the VE whether a hypothetical individual of Jackson's age, education and work history could perform work if the individual was limited to light, unskilled work and could not handle, finger or feel with the right, dominant hand; essentially, a one-armed individual. Tr. 111. The VE stated that there would be work for such an individual as a paint spray inspector, a visual inspection job (180,000 national jobs, 6,000 Ohio jobs, 2,500 regional jobs); a can filling machine tender (185,000 national jobs, 15,000 Ohio jobs, 3,000 regional

jobs); and a laboratory sample carrier (175,000 national jobs, 18,000 Ohio jobs, 3,000 regional jobs). Jackson's attorney asked whether the VE's answer would change if the individual was limited to sedentary, rather than light work, and the VE stated that such an individual could still perform visual inspection work, such as a touch-up screener (158,000 national jobs, 5,200 Ohio jobs, 1,700 regional jobs); inspector of wooden products (120,000 national jobs, 11,000 Ohio jobs, 2,500 regional jobs); and a table worker (125,000 national jobs, 5,000 Ohio jobs, 1,500 regional jobs). Tr. 111-112.

Next, Jackson's attorney asked the VE whether a hypothetical individual of Jackson's age, education and work history could perform work if the individual was limited to unskilled work and could lift no greater than 5 pounds; could stand and walk no more than 2 hours in an 8-hour day; and could rarely handle with the right, dominant hand. Tr. 113. The VE answered that there would be no work for such an individual due to the 5-pound lifting limitation. Tr. 113. Jackson's attorney asked the VE if a hypothetical individual of Jackson's age, education and work history could perform work if the individual was limited to light, unskilled work and can occasionally handle, finger and feel with the right, dominant hand; can have no contact with the public or coworkers; and can have no more than 10% contact (i.e,. 80 minutes) with supervisors. Tr. 113. The VE stated that such an individual could perform the jobs the VE cited in answer to the second hypothetical because those jobs are essentially one-armed jobs and do not require contact with the public. Tr. 113. He explained that, after 30 days, one would not expect more than 80 minutes with supervisors. Tr. 113. Jackson's attorney verified that the VE's answer included the limitation that the individual have no contact with coworkers; the VE stated that his answer was in error and that no interaction with coworkers was not possible for someone

performing unskilled work; therefore, there would be no work such an individual described could perform. Tr. 114.

Next, Jackson's attorney asked the VE whether a hypothetical individual of Jackson's age, education and work history could perform work if the individual was limited to unskilled work and would miss 2 days per month on a regular basis and the VE stated that such an individual could perform work, but not if he missed more than 2 days per month. Tr. 114. Jackson's attorney asked the VE if absenteeism is more scrutinized during a probationary period and the VE agreed that it would be and that it would be very important to attend every day of the probationary period. Tr. 115. Jackson's attorney asked the VE whether a hypothetical individual of Jackson's age, education and work history could perform work if the individual was limited to unskilled employment and would be off-task 15% of a work shift. Tr. 115. The VE answered that 15% would be acceptable but anything over 15% would not. Tr. 115.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her August 3, 2016, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1. The claimant has not engaged in substantial gainful activity since July 31, 2014, the application date.  Tr. 57.

2. The claimant has the following severe impairments: arthropathy due to remote gunshot wound, affective disorder, post-traumatic stress disorder, personality disorder, history of substance abuse disorder.  Tr. 57.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 58.

4. Applying the principles of Drummond, I have adopted the prior ALJ's findings, and conclude that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can occasionally climb ladders, ropes, and scaffolds; he can occasionally stoop and crouch and frequently crawl; he has concentration sufficient to perform routine, repetitive tasks; his social function is adequate for superficial and occasional interactions with others; his stress tolerance allows adaptation to work settings in which duties are routine and predictable; and he is limited to a static work environment with infrequent change.  Tr. 61.

5. The claimant is unable to perform any past relevant work.  Tr. 65.

6. The claimant was born in 1971 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 65.

7. The claimant has a limited education and is able to communicate in English.  Tr. 65.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 66.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 66.

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 31, 2014, the date the application was filed.  Tr. 67.

### V. Plaintiff's Arguments

Jackson argues that the ALJ's determination that there was no material worsening of Jackson's mental health and her adoption of the prior ALJ's mental RFC assessment were in error and unsupported by substantial evidence.  Doc. 17, p. 1.

### VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

When a claimant previously filed an application for benefits and an ALJ rendered a decision, an ALJ considering a claimant's new application encompassing a different time period may find that the prior ALJ's findings are legitimate and adopt those findings absent new and material evidence. *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018); *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997).

### VII. Analysis

Jackson argues that the ALJ erred because she "erroneously dismissed [his] new diagnoses and limitations." Doc. 13, p. 10. Specifically, he argues that the ALJ failed to consider his PTSD, his substance abuse now in remission, and his "schizophrenia spectrum disorder based on persistent auditory hallucinations." Doc. 13, p. 10. This argument fails.

The ALJ discussed Jackson's alleged new symptoms and concluded that she did not find them to be worsening. She recited Jackson's alleged limitations described in his prior

application and observed that these generally remained the same during the time period covering his present application. Tr. 61-62. She recognized that Jackson's substance abuse was now in remission. Tr. 62. She also acknowledged his new diagnoses of PTSD and accurately explained that this diagnosis, symptoms of which Jackson experienced since 2007, was a clarification of an existing mental problem rather than a new problem. Tr. 58. She also did not find credible Jackson's recent reports of persistent auditory hallucinations and his talking to an imaginary friend, which served as the basis for Jackson's claim of a schizophrenia spectrum disorder. Tr. 65.

Regarding his alleged mental limitations, the ALJ explained that, although Jackson received more mental health treatment during the current application time period then he had before, the evidence did not show his symptoms had changed in severity or frequency since the prior ALJ's determination. Tr. 63. The ALJ commented that Jackson's treatment was conservative and somewhat sporadic; he initially saw psychiatrist Dr. Stefanac because his lawyer told him to and not because his symptoms had worsened; counselor Blake's treatment notes from late 2014-early 2015 showed that he improved with therapy and coping exercises; there was no evidence of inpatient treatment or emergency department visits; he received medications from his primary care physician, Dr. Weinberger, and he had denied depression and anxiety to him and had reported that his symptoms were well-controlled and stable on medication (in contrast to his report to the providers at the Murtis Taylor Center "just a few months prior to the hearing" in which, for the first time, Jackson alleged that he had an imaginary friend and hallucinations since 2008); although mental exam findings did note some signs and symptoms, these were already considered and accounted for by the prior ALJ's RFC; and Jackson's living situation remained the same as it had during his prior application. Tr. 63.

In short, the ALJ did not err; she discussed the new evidence, including Jackson's new diagnoses, and determined that there was no new and material evidence showing that his symptoms had worsened.  *See* SSR 98-4(6), 1998 WL 283902, at *3.

Jackson also argues that the ALJ erred because she failed to assign appropriate weight to consultative examiner Dr. Rindsberg's opinion.  Doc. 13, p. 11.  To the extent he alleges that the ALJ should have provided "good reasons" for discounting Dr. Rindsberg's opinion (Doc. 13, p. 12), this argument lacks merit because an ALJ is only required to provide good reasons for a treating source opinion; Dr. Rindsberg is not a treating source.  *See, e.g., Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (an ALJ must give good reasons for discounting a treating source opinion); 20 C.F.R. § 404.1527(c)(2).[3]

The ALJ considered Dr. Rindsberg's opinion:

> The opinion of the consultative examining psychologist, Jeff Rindsberg, Psy.D., is entitled to little weight, as the psychologist's assessment was vague with respect to the nature and extent of the assessed limitations.  Dr. Rindsberg stated that the claimant could understand, remember and carry out instructions without difficulty; maintaining attention and concentration was "a problem" and he would have difficulty maintaining persistence and pace; dealing with people was a "problem" and his mistrust and anxiousness would affect his relationship with others; and his ability to handle work stress would also be "a problem." (10/31/2014, Exhibit B4F, p. 4).  Assuming Dr. Rindsberg was opining the claimant's mental impairments precluded basic mental work activities, that opinion is inconsistent with the claimant's mental status observed elsewhere in the record, including his subsequent reports to the primary care physician that his symptoms were well-controlled.

Tr. 64.  Jackson asserts that the ALJ's basis for rejecting Dr. Rindsberg's opinion was legally insufficient because she was not sufficiently specific or detailed.  Doc. 13, p. 12.  The Court disagrees; the ALJ accurately stated that Dr. Rindsberg's assessed limitations were "vague" because he merely stated that Jackson would have "problem[s]" without specifying what he

---

[3]  The version of 20 C.F.R. § 404.1527(c)(2) cited herein is no longer in effect but was at the time of the ALJ's decision.

could do.  Any lack of specificity in the ALJ's decision was due to inadequacies in Dr.

Rindsberg's opinion, not the ALJ's.  The ALJ also properly relied on the fact that the apparent

severe limitations Dr. Rindsberg assessed were inconsistent with the record, including treatment

notes from Jackson's primary care physician wherein Jackson reported his symptoms were well

controlled, and generally mild mental status examination findings.  *See* 20 C.F.R. § 404.1527(c)

(an ALJ considers the nature of the exam, the area of the provider's expertise, the supportability

of the opinion and the consistency with the record as a whole).

Finally, Jackson claims that the ALJ's reasoning was inconsistent with counselor Blake's

opinion, but the ALJ discounted Blake's opinion and Jackson does not challenge that portion of

the ALJ's decision.  And, as discussed above, the ALJ did not credit the recent severe symptoms

reported by Jackson to his latest mental health provider.  The ALJ's decision is supported by

substantial evidence and must, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial

evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.



Dated: August 17, 2018
                                                    */s/ Kathleen B. Burke*
                                                    _____
                                                    Kathleen B. Burke
                                                    United States Magistrate Judge